## City of Kinmundy v. Otto Anderson.

1. Master and Servant—*Limitation upon Rule that Servant Does Not Assume the Risk of Dangerous Machinery.*—While it is the law that a servant does not assume the risk of dangerous machinery, if he continues to work, relying upon the promises of the master to make it reasonably safe, it is subject to these conditions: First, that the danger is not so imminent, that a reasonably prudent man would not assume the risk; second, that he does not continue to work with the unsafe machinery, when a reasonable time has elapsed for its repair, the master having failed to keep his promise to make it safe. What is a reasonable time is for the jury to decide.

2. Same—*Where Servant Assumes Risk.*—If it is made optional with the plaintiff to shut down the plant in case he thinks its operation dangerous, under such option, if he continues to operate the plant, it is at his own risk, and there can be no recovery for injuries received.

Trespass on the Case, for personal injuries. Appeal from the Circuit Court of Marion County; the Hon. Truman E. Ames, Judge presiding. Heard in this court at the February term, 1902. Reversed. Opinion filed September 11, 1902.

Suit by appellee to recover for personal injuries received while superintending the operation of the electric light plant of appellant, the injuries caused by the breaking of

a belt running from the drive wheel of the engine to the pulley on the dynamo.

The case was tried upon the second and third counts.

These counts allege that appellee was injured by reason of an unsafe and defective belt furnished by defendant, together with the close proximity of the pulleys on the engine and dynamo, and the failure of appellant to furnish an appliance called an "idler," to steady the motion of the belt and check its vibration. The declaration alleges that plaintiff had repeatedly notified defendant of the unsafe condition of the belt, and that an "idler" was required to make its use safe, and that defendant had repeatedly promised to supply an "idler." It alleges that plaintiff, relying upon said promises, continued to operate said plant for a reasonable time for defendant to fulfill its said promises, and that while so doing, and while plaintiff was inspecting the said belt, the belt broke and hit plaintiff, injuring him, etc.

Defendant pleaded the general issues. Verdict and judgment for plaintiff for $3,200, from which defendant appealed.

T. E. MERRITT, CHARLES H. HOLT and L. M. KAGY, attorneys for appellants.

W. F. BUNDY and FRANK F. NOLEMAN, attorneys for appellee.

MR. JUSTICE WORTHINGTON delivered the opinion of the court.

Appellee was an electrician and engineer of ten years experience, and was superintendent of appellant's electric light plant, for lighting the city of Kinmundy. At the time of the accident it was not used for that purpose, but was operated to furnish light for pay to those desiring it.

The evidence sustains the allegations, that the belt was defective and unsafe, and that the "idler" was necessary to steady its motion, and that in consequence of such defective condition, and the absence of an "idler," the belt broke and injured appellee, as he alleges.

City of Kinmundy v. Anderson.

The allegations that appellee repeatedly requested appellant to furnish an "idler," and notified appellant that it was dangerous to operate the plant without it, and that appellant promised to furnish one, are supported by the evidence.

A ninety-six-inch drive wheel had been substituted for a sixty-inch wheel. A twelve-inch link belt had been constructed by appellee out of the old ten-inch belt, and eight feet of new belt, to be used on this larger wheel. The belt was heavy. It sagged and flopped when in motion. To prevent this "flopping," the appliance designated as an "idler" was to be used. This widened belt was applied in January, and was used until the accident occurred, on March 18th following.

Appellee testifies, in substance:

"That he notified the city authorities of the flopping of the belt, and that it was dangerous, and requested that they should procure suitable appliance to stop its flopping; that he does not know the number of times he complained about it—the first time was the last part of February, or the middle of February—and that they talked with a machinist in Kinmundy in regard to making an idler; that the electric light committee did this in his presence. The machinist drew a plan to show what they needed. The committee promised that they would procure an idler or some other appliance. 'I told them that I considered it very unsafe to stay there, and that I wouldn't do it unless there was something done to stop that and make it safe. I relied on their promise to get a suitable appliance. They commenced at once about getting one. Mr. Rhoads refused, for some reason or other, to make the appliance. I went to Mr. Davis, one of the electric light committee, and said to him that I considered it very dangerous to try to pull our full load with that belt in the condition it was in, jumping and flopping. I wanted him to procure an idler to hold the belt steady. He said he would do it; that he would see the rest of the council and the committee, and bring it up before the council right away and see what could be done, and in a few days sent me to Centralia to see Mr. Benson in regard to getting one. The electric light committee sent me. I went to see Mr. Benson about the first of March, or the last of February. Mr. Benson

had nothing that was suitable for the purpose. * * *
I stayed at work because I was satisfied they would comply
with their promises.'"

In cross-examination appellee testified:

"I have been a practical experienced engineer and elec-
trician for some time. * * * I am familiar with elec-
tricity, electric appliances, and electric machinery. I know
to a certain extent when they are dangerous. As an expe-
rienced man I could tell very well whether they were safe
or dangerous. I have had twelve or fifteen years experience
as electrician and engineer. * * * It was several days
before the first of March that I decided that I wanted an
idler. They would have to get it from some party who
deals in these things at St. Louis, Chicago, New York or
Boston. It would take probably twelve or fifteen days to
get one from St. Louis, according to whether they had one
in stock or not. They said they would get something to
prevent or stop the flopping of the belt and make it safe.
That was all I complained of, yes, sir. This flopping and
jumping had continued for a couple of months before I was
hurt. The belt had been widened since January. The belt
commenced jumping along in February. * * * I con-
sidered it dangerous the last part of February; it was dan-
gerous from that, right along. I considered it dangerous
the night I got hurt, but not any more so than at any other
time. When I came in that evening I saw the belt flopping.
I didn't think the belt was in immediate danger of break-
ing. I knew the flopping was a great strain to the belt.
I knew they were trying to get the idler, but it wasn't there
at present. I concluded to run without the idler that night.
To the best of their promise it wouldn't be more than a
day or two until it was there. I thought it might break;
that it was dangerous, but a man wouldn't and couldn't
think a belt would break at any special time. I thought it
was dangerous at the time."

The evidence of appellee shows that he operated the plant,
knowing it to be, as he himself expressed it, "very unsafe."
This condition was apparent to him "several days before
the first of March," "about the middle or last of February,"
as nearly as he can fix the date. It was then that he first
complained to the mayor and electric light committee.
According to his own statement, it would take from twelve
to fifteen days to get an idler if procured from St. Louis, the

presumption being that it would take longer if procured from Chicago, Boston or New York. Appellee testifies "that the flopping and jumping of the belt," which made it dangerous, had continued for a couple of months. During this time, appellee continued operating the plant.

While it is the law that a servant does not assume the risk of dangerous machinery, if he continues to work, relying upon the promises of the master to make it reasonably safe, it is subject to these conditions: First, that the danger is not so imminent, that a reasonably prudent man would not assume the risk; second, that he does not continue to work with the unsafe machinery, when a reasonable time had elapsed for its repair, the master having failed to keep his promise to make it safe. What is a reasonable time is for the jury to decide. Mo. Furnace Co. v. Abend, 107 Ill. 51; Ill. Steel Co. v. Mann, 170 Ill. 208; I. C. R. R. Co. v. North, 97 Ill. App. 124.

If it was made optional with appellee to shut down the plant in case he thought its operation dangerous, under such option, if he continued to operate the plant, it would be at his own risk and there could be no recovery for injuries received. Am. & Eng. Ency., Vol. 14, p. 858, Sec. 18.

If appellee was directed to shut down the plant if he thought it unsafe, and continued to run it knowing it to be unsafe, it is clear that he can not recover.

Appellee testifies, Record, p. 68:

"Q. You state to the jury if, when you told Mr. Davis that you wanted an idler or something to keep the belt from flopping, he didn't tell you to take no risk, if there was any danger to shut the plant down. A. He said for me not to run the arc lights but to keep the commercial lights running if possible.

Q. Did he tell you not to take any risk, but to shut the plant down if there was any danger? A. I don't remember him making any such statement.

Q. Do you say that Mr. Davis did not tell you to shut the plant down if there was any danger? A. He did after the belt got to flopping; I don't remember before that.

Q. Did Mitch Allen tell you the same thing? A. Well, I don't remember.

Q. Didn't Mr. Smith tell you the same thing? A. Not that I remember after the belt was repaired; before the repair work was done on the engine—yes, sir; before the engine was repaired, running at the speed it was and in the shape it was, I finally told them I was going to stop the plant, and Messrs. Mathews, Smith and Davis said if it was absolutely dangerous, to shut the plant down; then they got the repairs made on the engine. They never revoked that order to shut the plant down if it was dangerous that I know of. They always told me to keep the commercial lights running whether I did the arc lights or not; they didn't say anything about the danger part."

Davis, Smith and Allen were members of the electric light committee, whom appellee recognized as agents of appellant and with whom, according to his own testimony, he consulted, and complained to, in reference to the condition of the light plant.

Davis testifies that about a week before the accident, that appellee "sent Mr. Nevilles for me." "I went over and didn't like the way the belt was acting and told him (appellee) to take no risk, rather shut the plant down than run the risk."

T. M. Smith, an alderman and a member of electric light committee testifies:

"I was over there one night to see Mr. Anderson in regard to the street lights; the people were complaining a great deal and I talked with Mr. Anderson about it. He claimed he couldn't pull it on account of the way the belt was flopping. We were talking about an idler; he thought if he could get a tightener we could pull it all right. He was then pulling the commercial lights; I didn't like the way the thing was running and I told Mr. Anderson not to take any chances with it; better shut the thing down than to have an accident or get hurt."

Appellee does not deny this, but says he don't remember it.

A. M. Allen, an alderman and member of the electric light committee, testifies:

"While Mr. Anderson was employed there he had the full control of the electric light plant himself. The first time, I think, that I ever gave Mr. Anderson any instructions in regard to running the plant was just after they

put the large drive wheel on. There was a rumor over town that the wheel was too large, or something, any way that it was dangerous. Mr. Benson had recommended it to us that it was safe and I and Mr. Anderson was over to the plant talking about the plant, and about what was being said about it and I told him : ' Now, Mr. Anderson, if you have got any fears about this wheel being dangerous, shut down the plant.' Afterward, when we were talking about the tightener, after the belt was widened, I told him if there was any danger of the belt breaking or anything, to shut down and take no risk. It was two different times in regard to the tightener, I expect about two weeks before the accident. * * * What I meant was, what I told Mr. Anderson was, that if he thought there was any danger to himself, to shut down."

The force of this testimony is sought to be weakened by statements of appellee's witnesses, that the order was to shut off the arc lights if it was dangerous, but to run the commercial lights if possible. But appellee in his testimony as to what Davis told him, does not so state the order. To the question, " Do you say that Mr. Davis did not tell you to shut the plant down if there was any danger," he answered, " He did after the belt got to flopping; I don't remember before that."

When a servant knowingly continues to work with dangerous machinery, relying upon the master's promise to repair, his right to recovery is based upon the presumption that the master has assumed the risk. But when the master notifies the servant not to continue, if there is danger, and the servant does continue, then the servant assumes the risk, notwithstanding the fact that the master has promised to remove the danger.

. We think that there is a clear preponderance of evidence in this case, sustaining these two propositions : first, that appellee knew for two months before the accident, that it was very unsafe and dangerous to work near the belt without an "idler;" second, that appellee was notified to shut down the plant if he considered its operation unsafe. So finding, it follows that appellee assumed the risk of operating unsafe appliances and therefore can not recover.

The judgment of the Circuit Court is reversed.

The following finding of facts will be incorporated in the record : We find that appellee, knowing it to be unsafe and dangerous to operate the electric plant in its condition, continued to operate it, waiting for it to be repaired, and after having been told by appellant, through its authorized agents, to shut down the plant if he thought it to be unsafe, and therefore find that appellee assumed the risk of operating the plant in its unsafe condition.